## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| SHARON DANIEL, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 5:18-CV-417 (MTT) |
| | ) | |
| BIBB COUNTY SCHOOL DISTRICT, | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER

Defendant Bibb County School District ("School District") moves for summary judgment on Plaintiff Sharon Daniel's claims of race discrimination, retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and age discrimination and retaliation in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"). Doc. 11. For the following reasons, that motion is **GRANTED**.

### I. BACKGROUND[1]

#### A. Daniel's first three academic years in the School District

Daniel is a 58-year-old Caucasian female teacher who started working for the School District in 2014. Doc. 14-21 at 1, 2. The School District issues contracts to educators on an annual basis for terms beginning in July and continuing through May of the following year. Doc. 11-5 at 2. Daniel was initially hired to teach in the My Ascend Math program at Howard Middle School, which was part of a Title I Flexible Learning

---

[1] Unless stated otherwise, the facts are undisputed. The facts are viewed in the light most favorable to Daniel.

Program.  Doc. 14-21 at 3.  In this program, she taught remedial math to sixth, seventh, and eighth graders.  Doc. 11-12 at 48-49.  When the My Ascend Math program moved to Ballard-Hudson Middle School, Daniel was given the option of staying at Howard Middle School or moving with the Title I program to Ballard-Hudson.  *Id.* at 49.  She chose to move to Ballard-Hudson for the 2015-16 academic year, and she stayed there for the 2016-17 and the 2017-18 academic years.  *Id.* at 49-50.

During the 2015-16 and 2016-17 academic years, Daniel continued to teach the My Ascend Math program.  *Id.* at 50.  In that position, she taught a scripted remedial math program and had approximately ten students in her class at any given time.  Doc. 11-3 at 1.  Eclan David was the principal at Ballard-Hudson during this time, Chanelle Sweet was the assistant principal, and Joanna Summerow was Daniel's immediate supervisor.  Docs. 11-7 at 8; 11-12 at 50-51.  These two academic years passed without incident.  Doc. 11-6 at 24.

The Title I My Ascend Math program was discontinued at the end of the 2016-17 academic year.  Docs.  11-3 at 2; 11-12 at 51.  Daniel expressed to David that she wanted to move to an eighth-grade classroom and teach either English/Language Arts ("ELA") or Georgia history.  Docs. 11-3 at 2; 11-12 at 51-52.  When she returned for the 2017-18 school year, however, she was told that she would be teaching ELA to sixth-grade students.  Doc. 11-12 at 53.

### B.  Daniel's fourth academic year in the School District

David decided to place Daniel in the sixth-grade ELA classroom on a four-teacher team in which each teacher teaches a single content area.  Doc. 11-3 at 2.  Daniel's team members were Dannita Stanley, Corey Jones, and Brittani Thomas.  Doc. 11-6 at 16.  Ranata Brown co-taught one of Daniel's classes.  Doc. 14 at 3.  Stanley,

Jones, Thomas, and Brown are African American.  Doc. 11-12 at 94.  Daniel's

immediate supervisors were David and Sweet.[2]  *Id.* at 51.

David determined Daniel would be better suited to the sixth-grade placement

because (1) she had never taught in a regular classroom with an unscripted setting in

the School District; (2) the content for the sixth grade was less advanced than that for

the eighth grade, and (3) classroom management concerns are less challenging with

sixth-grade students versus eighth-grade students.[3]  Doc. 11-3 at 2.  Daniel stated that

David simply told her that "he needed [her] in the [sixth] grade."  Doc. 11-12 at 246.

Daniel testified that she began to experience difficulties almost immediately.

During the first week of school, she and other teachers were discussing how

aggressively some of the students behaved.  Doc. 11-12 at 77.  Daniel made what she

termed "the common joke," that "if you want to get ghetto, [she] can get ghetto with

you."  *Id.*  Team member Jones took offense and complained to David.  *Id.* at 78.  David

called Daniel, Sweet, and Jones into his office.  Doc. 14 at 10.  Daniel explained that

she did not consider the expression racist.  Doc. 11-12 at 78.  She apologized for

offending Jones.  Doc. 14 at 10.  David accepted her explanation and told everyone to

"move on."  Doc. 11-12 at 79.

From that point on, Daniel claims her team members treated her "differently" and

made her feel like an "outsider."  *Id.* at 98, 216.  She alleges her team members

harassed her at meetings, made "snide remarks questioning [her] professionalism," and

---

[2] At some unknown time prior to March 8, 2018, David removed Sweet as Daniel's immediate supervisor and put Kenya Miller in her place.  Doc. 11-12 at 72-74          .

[3] Daniel disputes that classroom management concerns are less challenging in sixth grade than in the eighth grade because sixth graders can be more difficult to manage given the differences in their maturity levels.  Doc. 14-21 at 5-6.  Daniel does not dispute that she had never taught a regular sized classroom with an unscripted curriculum in the School District; that the content is less advanced for the sixth grade versus the eighth grade; or that the eighth-grade teachers teach two content areas versus the single content area taught by sixth-grade teachers.  Docs. 11-1 at 2, 8; 14 at 3, 5.

did not allow her to have any input on team decisions. *Id.* at 85. She states that team members harassed her based on her age by telling her that she "might not be up on best practices because [she] had been teaching so long." *Id.* at 97. Daniel states that Sweet also treated her differently than she treated the other team members. *Id.* at 86. Specifically, Sweet chastised her for various infractions but did not chastise other team members for similar conduct. *Id.* at 87.

Daniel claims she made two verbal complaints to David during the 2017-18 academic year regarding her belief that she was being treated differently based on her age and race. *Id.* at 111. She does not, however, remember the dates of these complaints. *Id.* at 112. The first complaint involved an October 30, 2017 Letter of Concern[4] from Sweet to Daniel, in which Sweet accused Daniel of raising her voice and using the word "shit" in an October 26, 2017 meeting. *Id.* at 124; 11-13 at 80; 14 at 11. Daniel testified that she told David she never said "shit,"[5] and that Sweet wrote the Letter of Concern to harass Daniel because of her age and race. Docs. 11-12 at 111; 14 at 11; 14-21 at 6. According to Daniel, David said he did not believe that Sweet meant to harass Daniel, and Daniel should not worry about the Letter of Concern because it would not go in her personnel file. Doc. 11-12 at 111. On the second occasion, Daniel states that Sweet had "chewed [her] out" for leaving a Positive Behavior Interventions and Supports ("PBIS") celebration. *Id.* at 112. Daniel complained to David, telling him that "the harassment because of [her] age and race

---

[4] "Letters of Concern" are letters, Doc. 11-13 at 9, or memos, *id.* at 80, from an administrator to a teacher in which the administrator communicates her administrative concern regarding the teacher's conduct or actions.

[5] Daniel testified that she actually used the word, "ass." Docs. 14 at 11; 14-21 at 6.

was continuing and that something needed to be done about it." *Id.* Daniel does not know if David investigated these complaints. *Id.*

David denies that Daniel ever complained of race or age discrimination or complained that she was being harassed or mistreated by team members. Doc. 11-6 at 26. He acknowledges, however, that Daniel and her team "weren't necessarily always on the same page." *Id.* at 22.

### C.  Daniel's evaluations and Letters of Concern

The School District uses the Teacher Key Effectiveness Systems ("TKES") to evaluate teachers. Doc. 11-4 at 2. Sweet was responsible for evaluating the sixth-grade teachers during the 2017-18 school year. *Id.* at 1. Sweet was Daniel's "Get Better Faster"[6] coach and performed regular observations of Daniel and provided feedback regarding Daniel's instructions and classroom management. *Id.* at 3. Sweet evaluated Daniel's classroom performance on October 15, 2017, November 5, 2017, and November 27, 2017. *Id.* at 2. Sweet's evaluations of Daniel revealed weaknesses in the areas of classroom management, instructional strategies, instructional planning, and differentiated instruction. *Id.* Although Daniel had the opportunity to respond to Sweet's evaluations, she chose not to do so. *Id.*

Ballard-Hudson also assigned two staff academic coaches to work with Daniel on instruction. *Id.* at 3. A November 27, 2017 report from academic coach Priscilla Brown claimed that Daniel failed to monitor or assist students during a test and failed to have anything for the students to do after they completed the test. Doc. 11-13 at 116. Brown noted that there "was a lot of instructional time wasted." *Id.* A February 5, 2018 report

---

[6] The "Get Better Faster" program offered observation, feedback, and coaching to assist teachers who struggled with behavior and instruction strategies. Doc. 11-4 at 3.

from academic coach Marshelia Tillman claimed that Daniel sat at her desk while students worked on an assignment and a co-teacher walked around the room to monitor the students.  *Id.* at 117.  Tillman noted that Daniel failed to go over the standard or learning targets with students and displayed a lack of management skills when she "redirected [students] by screaming at" them.[7]  *Id.*

As noted, on October 30, 2017, Sweet sent Daniel a Letter of Concern in which Sweet accused Daniel of behaving unprofessionally in an October 26, 2017 meeting when Daniel used the word, "shit."  *Id.* at 80.

In a second Letter of Concern dated January 5, 2018, Paige Busbee, the School District's Assistant Superintendent for Human Resources, informed Daniel that the School District had completed its investigation into allegations that Daniel inappropriately redirected a student by grabbing him by the neck and pushing him into the hallway.  *Id.* at 9.  Busbee reviewed a video of the incident and concluded that Daniel made "physical contact" with the student, but did not push the student or "caus[e] injury to his neck or . . . act[] with intent by placing [her] hand at the base of [the student's] neck."  *Id.*  Busbee advised Daniel to refrain from making physical contact with students in the future unless the contact was for one of two specific reasons: (1) to prevent the student from injuring himself or another, or (2) if the contact was to show praise or support.  *Id.*; Doc. 11-12 at 144-46.

Daniel's January 19, 2018 mid-year professional learning plan progress note concluded Daniel was not making adequate progress on her professional learning goals or plans.  Doc. 11-12 at 156.  David reviewed the mid-year progress note with Daniel,

---

[7] The term "redirected" appears on several occasions in the record.  The parties do not define the term, and the Court gives the term its ordinary meaning: "Direct (something) to a new or different place or purpose."  https://www.lexico.com/en/definition/redirect (May 3, 2020).

and she was, therefore, aware that the School District did not think she was making adequate progress.  *Id.* at 157.  Additionally, notes from Daniel's mid-year conference documented (1) that she was "receiving support for classroom management issues"; (2) that Daniel expressed concerns about support from her team and the administration; and (3) David and Daniel "discussed changes in Dr. Daniel's status for next year and will continue to monitor."  Docs. 11-4 at 42; 11-12 at 157

### D.   The decision to nonrenew Daniel's contract

David was the "sole decision-maker" at Ballard Hudson who could make recommendations for the renewal or nonrenewal of teachers' contracts.  Doc. 11-3 at 3. He made recommendations regarding nonrenewal of contracts to the School District's Human Resource Department.  *Id.*  He did not get recommendations from other administrators or teachers at Ballard-Hudson regarding whose contract should be renewed or nonrenewed.  Doc. 11-6 at 10-11.

He "recommended Daniel for nonrenewal based on poor classroom management and failure to implement proper instructional strategies which were documented throughout the year and Daniel failed to show improvement."  Doc. 11-3 at 3.  David submitted the at-risk form, which documents any areas of concern and previous actions taken, and supporting documentation[8] to Busbee on March 2, 2018.  Docs. 11-3 at 8-

---

[8] The supporting documents included (1) a November 17, 2017 email from Sweet to Daniel in which Sweet complains that Daniel told a student to leave the classroom despite the fact that Daniel had been previously informed in meetings and one-on-one that she "cannot put students out of class" because middle school students must be supervised at all times, Doc. 11-3 at 11; (2) the October 30, 2017 Letter of Concern in which Sweet accuses Daniel of using profanity, *id.* at 12-13; (3) the results from Sweet's October 5, 2017, October 31, 2017, and November 17, 2017 evaluations, which showed that Daniel needed improvement in instructional planning, instructional strategies, and differentiated instruction, *id.* at 14-15, 39-64; (4) the November 27, 2017 and February 5, 2018 feedback from academic coaches Brown and Tillman showing that Daniel failed to monitor or assist students during their tests, failed to have anything for the students to do after completion of the test, wasted a "lot of instructional time," and "redirected [students] by screaming at" them," *id.* at 16-20; (5) January 26-27, 2018 emails from academic coach Tillman to Daniel complaining that Daniel failed to leave written instructions for the substitute teacher and enough work for the students when Daniel was absent from class, *id.* at 21; (6) a February

71; 11-5 at 1-2; 11-6 at 30-31.  David met with Busbee and the Human Resources at-risk team on March 6, 2018 to discuss his recommendations for nonrenewal.  Doc. 11-5 at 3.  On March 12, 2018, Busbee emailed David a list of five employees,[9] one of whom was Daniel, and asked him to "[p]lease confirm these employees will not get contracts and are nonrenewed."  Doc. 14-9 at 2.  On March 13, 2018, David responded that one of the five employees on the list had submitted his resignation letter, David had "decided to bring back" one employee on the list, and the remaining three, including Daniel, were to be nonrenewed.  *Id.*  On March 20, 2018, the School District issued a formal nonrenewal letter to Daniel.  Doc. 11-5 at 4.

### E.  March 8, 2018 grade-level meeting

While the School District was in the process of deciding to nonrenew Daniel's contract, there was a grade-level meeting at Ballard-Hudson with all the sixth-grade teachers and some administrators.  Doc. 11-3 at 4.  During that March 8, 2018 meeting, Daniel and her team members became involved in a heated discussion.  *Id.*  When Daniel rose from her seat to leave the classroom, Stanley stood up from her chair.  Doc. 11-3 at 4; 11-12 at 103-07.  Daniel testified that "Stanley . . . came toward [her] with her fist in the air."  Doc. 11-12 at 103.  According to Daniel, David "jumped up, opened the door, and pushed [Daniel] out the door."  *Id.* at 103-04.  David testified he attempted to diffuse the situation by stepping between Stanley and Daniel, and he escorted Daniel

---

15, 2018 email from coach Tillman to Daniel praising Daniel's use of "Close Reading strategies," but complaining that the "activity on the back of the reading passage had no rigor and was way below the intent of any of the 6th grade standards" and asking that Daniel make sure she posts her lesson plans on time, *id.* at 23; (7) a November 16, 2017 email from academic coach Brown to Daniel stating that Daniel missed her appointment to view the uploaded video of Daniel teaching, *id.* at 24; and (8) the mid-year evaluation dated January 19, 2018, showing that Daniel was not making adequate progress on her professional learning goal, *id.* at 31.

[9] Jones, one of Daniel's teammates, was nonrenewed for reasons similar to the reasons for Daniel's nonrenewal.  Doc. 11-6 at 32.

out of the classroom because she was nearer to the door.  Doc. 11-3 at 4.  Daniel immediately left Ballard-Hudson and went to the School District's main office to report the incident.  Doc. 11-12 at 104, 234.

Daniel met with Busbee on March 12 to discuss what happened during the March 8 meeting.  Docs. 11-5 at 3; 11-12 at 234-35.  After her meeting with Busbee, Daniel returned to Ballard-Hudson, and she asked[10] David to be moved to an eighth-grade position.  Docs. 11-3 at 5; 11-12 at 71, 193-96.  David placed Daniel in the seventh-grade ELA position then held by a long-term substitute.  Doc. 11-3 at 5.  David testified that he did not consider Daniel for the eighth grade position that covered two content areas and was staffed by a long-term substitute because Daniel had not demonstrated the skills necessary to manage her classroom and she had not demonstrated the skills necessary to implement proper instructional strategies in a single-content classroom with a less advanced curriculum.  *Id.*

### F.  Daniel's charge of discrimination

On March 16, 2018, Daniel filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  Doc. 11-13 at 106.  Daniel complained of hostility, harassment, and discrimination.  *Id.*  She stated that she was denied an eighth-grade teaching position and removed from a sixth-grade position based, at least in part, on her race.  *Id.*  Daniel complained that David told her that her contract would not be renewed for the 2018-19 academic year and that the nonrenewal was based on race.  *Id.*  She alleged that she was subjected to "retaliation based on her opposition to racism against her."  *Id.*

---

[10] Daniel testified that she had been requesting to be moved from the sixth-grade position since November 2017.  Doc. 11-12 at 71, 193.

On March 20, 2018, the School District issued a formal nonrenewal letter to Daniel.  Doc. 11-5 at 4.  On March 21, 2018, the Bibb County School District received notice of Daniel's Charge of Discrimination.  *Id.*

On March 28, 2018, Daniel filed a second Charge based on the School District's letter of nonrenewal.  Doc. 11-13 at 125.  She alleged that "[a]fter previously complaining of harassment based on her race, [she] received a letter advising her that she was not being renewed as a teacher.  The nonrenewal is based at least in part on [her] race, age[,] and on her prior protected activity."  *Id.*

The EEOC issued its Dismissal and Notice of Rights on August 1, 2018.  Doc. 11-13 at 127.  Daniel filed this suit on November 5, 2018.  Doc. 1.

## II.  SUMMARY JUDGMENT STANDARD

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether a genuine dispute of material fact exists, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).  A material fact is any fact relevant or necessary to the outcome of the suit.  *Id.* at 248.  And a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party."  *Id.* (citation omitted).  Accordingly, "the mere existence of a scintilla of evidence in support of the position will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party."  *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1243 (11th Cir. 2001) (citation and punctuation marks omitted).

The party moving for summary judgment bears the burden of showing there is no issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may make this showing by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by showing that the non-movant cannot produce admissible evidence to support the issue of material fact.  Fed. R. Civ. P. 56(c)(1).  If the movant meets this burden, the non-moving party must produce evidence showing that an issue of material fact does exist.  *Celotex Corp.*, 477 U.S. at 324.  To do so, the non-moving party must "go beyond the pleadings" and identify "specific facts showing a genuine issue for trial."  *Id.*; *see also* Fed. R. Civ. P. 56(e)(2)-(3).  However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Anderson*, 477 U.S. at 255 (citation omitted).

## III.  RACIAL DISCRIMINATION UNDER TITLE VII

Lacking direct evidence, Daniel relies on circumstantial evidence to establish her race discrimination claims, employing the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Doc 13 at 2.  "Faced with a defendant's motion for summary judgment, a plaintiff asserting an intentional-discrimination claim under Title VII . . . must make a sufficient factual showing to permit a reasonable jury to rule in her favor."  *Lewis v. City of Union City*, 918 F.3d 1213, 1217 (11th Cir. 2019).  When a claim of discrimination is based on circumstantial evidence, "the now-familiar three-part burden-shifting framework established by the Supreme Court in *McDonnell Douglas*" applies.  *Id.*

Pursuant to *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination.  In order to prove a prima facie case of race discrimination, the plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the position; (3) "she was subjected to an adverse employment action"; and (4) "her employer treated 'similarly situated' employees outside her class more favorably."[11] *Lewis*, 918 F.3d at 1220-21 (citation omitted).

If a plaintiff establishes a prima facie case, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).  This burden of production means the employer "need not persuade the court that it was actually motivated by the proffered reasons" but must produce evidence sufficient to raise a genuine issue of fact as to whether it discriminated against the plaintiff.  *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (quotation marks and citation omitted).

The plaintiff then has the opportunity to show that the employer's stated reason is pretextual.  This may be done "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Burdine*, 450 U.S. at 256.  "If a plaintiff produces sufficient evidence that the employer's proffered reason is merely pretextual, that evidence may sometimes be enough to preclude summary judgment in favor of the employer."  *Kragor*, 702 F.3d at 1309 (citation omitted).

---

[11] In wrongful termination claims, the fourth element of *McDonnell Douglas* can also be satisfied by showing the Plaintiff was replaced by someone outside her protected class. However, as discussed below, Daniel does not argue she was replaced by someone outside her protected class, nor is there evidence in the record to support such an argument.

In her complaint, Daniel alleges three adverse employment actions that were based, at least in part, on her race: (1) denial of an eighth-grade teaching position; (2) transfer from a sixth-grade teaching position; and (3) nonrenewal of her employment contract with the School District.  Doc. 1.  In her ten-page response brief[12] to the School District's motion for summary judgment, Daniel does not address her claims that denial of the eighth-grade teaching position or transfer from the sixth grade were adverse employment actions based on her race, and she has, therefore, abandoned those claims.  Doc. 13.  Instead, she alleges for the first time—and thus without amending her complaint—that the School District's failure to remove her from the sixth-grade position earlier was an adverse employment action based on race.  *Id.* at 2-3.  "[A] plaintiff cannot amend h[er] complaint through argument made in h[er] brief in opposition to the defendant's motion for summary judgment."  *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir.  2013); *Monaghan v. Worldpay*, __F.3d __, 2020 WL 1608155 at *3 (11th Cir. 2020).

The Court first addresses Daniel's termination claim, then briefly addresses her abandoned and new claims.

## A.  Nonrenewal of Daniel's contract for employment

### 1.  *Daniel cannot show a prima facie case*

For Daniel's termination claim, the School District concedes all but one element of Daniel's prima facie case.  It argues that Daniel cannot show she was replaced by someone outside of her class or "that her employer treated 'similarly situated' employees outside her class more favorably."  Doc. 11-2 at 13.

---

[12] Brevity is a virtue.  But given Daniel's sweeping allegations and the voluminous record, ten pages is hardly more than a conclusion, leaving the Court, in an effort to be thorough, to painstakingly work its way through the morass.

In her complaint, Daniel did not allege that she was replaced by someone outside her class or allege a comparator.  Nor did she do so in her response brief.

In fact, Daniel's entire argument that there is sufficient evidence of disparate treatment to create an inference of discrimination is contained in one paragraph with no citations to the record:

> The record evidence viewed in the light most favorable to [Daniel] clearly establishes that [Daniel] was treated much less favorably than non-white coworkers.  As previously stated, [Daniel's] coworkers were able to avoid door duty in the morning, curse in the presence of students and even boldly admit that they had no intention of working with or helping another employee despite the fact that it was their job to do so without having to worry about any repercussions.

Doc. 13 at 4.

Clearly, Daniel failed to identify a comparator.  To show another employee is similarly situated, the plaintiff must show that the proffered comparator "is similarly situated in all material respects."  *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1227 (11th Cir. 2019).  Ordinarily, a valid comparator (1) will have engaged in the same basic conduct as the plaintiff, (2) will have been subject to the same employment policy or rule, (3) will have been under the same supervisor, and (4) will share the plaintiff's employment or disciplinary history.  *Id.*  Daniel does not even argue that any other employee of the School District was similarly situated.  Perhaps because Daniel never even alleged or argued a comparator, neither party cited or applied the *Lewis* standard.[13]  Daniel clearly has failed to show a valid comparator and cannot make out her prima facie case under the *McDonnell Douglas* framework.

---

[13] Still, on the Court's independent review, there is no evidence that the School District renewed the contracts of similarly situated employees outside of her class.  In fact, the record shows the opposite.  Her co-worker and team-member, Corey Jones, a twenty-four-year-old African American male, was nonrenewed for  "[p]retty much . . . similar issues[,] [j]ust poor classroom management, . . . classroom strateg[y] issues."  Doc. 11-6 at 32-33.

### 2. The School District met its burden of proffering legitimate, non-discriminatory reasons for terminating Daniel

Further, even if she could make out a prima facie case, the School District has offered legitimate, non-discriminatory reasons for nonrenewal of Daniel's employment contract.  Doc. 17 at 4.  David recommended nonrenewal of Daniel's employment contract because of Daniel's documented record of poor classroom management, failure to implement proper instructional strategies, and failure to show improvement in these areas.  *Id.* at 3.  Specifically, David's recommendation was based on Sweet's evaluations, which demonstrated weaknesses in the areas of classroom management, instructional strategies, instructional planning, and differentiated instruction, *id.* at 14-15; November 2017 and February 2018 evaluations from staff academic coaches, which demonstrated that Daniel failed to monitor or assist students during a test, failed to have anything for the students to do after they completed the test, wasted instructional time, and redirected students by screaming at them, *id.* at 16-20; Daniel's failure to follow procedures relating to student supervision and discipline, *id.* at 11; and a January 19, 2018 mid-year evaluation that showed Daniel was not making progress on her professional learning goals or plans, *id.* at 65-68; Doc. 11-12 at 155-57.

### 3. Daniel cannot show those reasons are pretextual

Given these non-discriminatory reasons, Daniel must show that the School District's legitimate, nondiscriminatory reasons are pretextual.  To show pretext, Daniel must "demonstrate[] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [School District's] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (quotation marks and citation omitted).

Daniel's efforts to establish pretext are minimal, conclusory, and devoid of record citations.  First, she argues that the timing of her at-risk designation somehow suggests pretext.  She states that the School District's "own forms" require that at-risk employees be identified no later than January 31, 2018, and David did not identify her as at-risk until March 2, 2018.  Doc. 13 at 3.  She alleges that "[t]here were no new evaluations or information that [the School District] obtained or generated between the last evaluation in November of 201[7] or the meeting with [Daniel] in January of 2018 and Principal David's identification of her as" at-risk.  *Id.*  Instead, on March 1, 2018, David just started "digging up dirt in an effort to rid himself of a problematic white employee."  *Id.*

The School District does not dispute that David began gathering documentation to support his recommendation for nonrenewal on March 1, 2018 and did not complete the at-risk form until March 2, 2018.  Doc. 18 at 25-26.  But, contrary to Daniel's arguments, an academic coach's November 2017 evaluation documented Daniel's failure to manage her classroom and employ instructional strategies.  Doc. 11-3 at 16.  The mid-year evaluation in January 2018 documented that Daniel had not made "adequate progress on . . . her PSC professional learning goals and/or plan."  Doc. 11-12 at 156.  Daniel admits that David reviewed the evaluation with her and made her aware that she was not making adequate progress.  *Id.* at 157.  Further, a February 7, 2018 academic coach's evaluation documented that Daniel failed to employ instructional strategies and "redirected students by screaming at" them instead of employing proper classroom management strategies.  Doc. 11-3 at 19.  Thus, Daniel's inability to manage her classroom and employ proper instructional strategies was documented throughout the 2017-18 academic year.

Daniel states that the School District's "inconsistent application of discipline creates not just doubt as to its sincerity in terminating [her], but it is evidence of its outright hostility towards [Daniel]." Doc. 13 at 9. But without citations to the record, the Court does not know what "inconsistent application of discipline" she is talking about. Perhaps she is referring to her allegation that Sweet "jumped all over her and berated her for not being outside her door" in the morning but did not scold other teachers for the same conduct, Doc. 14 at 13, and her allegation that Sweet wrote her up for saying "shit" when she actually said "ass" (which Daniel apparently finds less offensive),but Sweet did not write up a male African American sixth-grade teacher, Dr. Eppinger, for using the word "ass," *id.* at 11-12. However, there is no indication that David, the only administrator at Ballard-Hudson who could recommend nonrenewal, knew Daniel was rebuked for failing to stay at her door or knew that Daniel was written up for using profanity while Eppinger was not. Also, while David did know that Daniel was written up for using profanity, Daniel has produced only hearsay, which the Court cannot consider, that Eppinger was not written up. Specifically, Daniel's statement that Sweet did not write up Eppinger for using profanity is based on a conversation between Daniel and Eppinger in which Eppinger allegedly told Daniel that Sweet did not write him up. Doc.14 at 12. Daniel has no non-hearsay evidence that Eppinger was not disciplined.

Daniel also complains in a conclusory fashion that she "had everything stacked against her thanks to David and Sweet." Doc. 13 at 9. The record is to the contrary. The School District attempted to provide Daniel with the help she needed to enable her to effectively manage her classroom and implement proper instructional strategies. Two academic coaches worked with Daniel, and she attended a behavior management class with the District Response to Intervention Behavior Coordinator. Doc. 11-1 at 3; *see*

*Hutchins v. Bibb Cty. Sch. Dist.*, 2014 WL 66615, at *7 (M.D. Ga. 2014) (stating that "conclusory allegations that . . . [m]iddle [s]chool's administrators were conspiring against him and setting him up to fail" does not show pretext; the defendant produced evidence that it had taken remedial action to help the plaintiff improve his classroom management).

As an example of things being "stacked against her," Daniel states that "Sweet and Thomas even went so far as to encourage a student's family to file a formal complaint against [Daniel] for a non-event in an effort to get rid of her." Doc. 13 at 9. Again, Daniel fails to provide a record citation. The Court assumes she is referring to the incident in which she made physical contact with a student, who then complained that she grabbed him by the neck and pushed him into the hallway. Doc. 11-13 at 9. The student's mother complained to the School District that her son's neck was injured. Docs. 11-12 at 146; 11-13 at 9. The School District investigated and found that Daniel did make physical contact with the student, which is prohibited by School District policy, but that she did not push or injure him. Doc. 11-13 at 9.

Daniel testified that this incident was "totally race and age related." Doc. 11-12 at 147-48. She bases this conclusory allegation on her claim that one of the student's family members, whose name and relationship to the student she could not remember, told her that Sweet and Thomas encouraged the family to complain to the School District. *Id.* at 148. Daniel acknowledged that other than this statement from an unknown family member, she has no "evidence or fact to support [her] contention that . . . the report related to this incident had to do with discrimination against [her] related to [her] age or race." *Id.* at 148. This alleged statement from an unknown witness about Daniel's coworkers is not admissible to demonstrate pretext.

Daniel argues, again without citation to the record, that "[b]ecause of the disputed issues of material fact including the veracity of Defendant's proffer, summary judgment in this case must be denied."  Doc. 13 at 9.   To the extent Daniel offers this as separate grounds for finding pretext, rather than just a summing up of her pretext argument, a conclusory allegation of "disputed facts including the veracity of the Defendant's proffer" does not "meet that [proffered] reason head on and rebut it."  *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).  Conclusory, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment."  *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987) (citation omitted).

### 4.   Daniel cannot show a convincing mosaic of circumstantial evidence

Daniel attempts to support her race discrimination argument by claiming that her "coworkers were able to avoid door duty in the morning, curse in the presence of students and even boldly admit that they had no intention of working with or helping another employee despite the fact that it was their job to do so without having to worry about any repercussions."  Doc. 13 at 4.  As noted above, Daniel cannot show a comparator and does not argue a comparator.  Nonetheless, these allegations might, interpreted generously, be an attempt to show "'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'"  *Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)).  Even then, those allegations are so vague that the Court does not know exactly what incidents Daniel is talking about.  Maybe she is referring to (1) her allegation that Sweet chastised her alone for failing to remain outside her door in the morning, Doc. 14 at 13; (2) her allegation that Sweet wrote her up for using profanity but did not write Eppinger up

when he said the same word, *id. at 11-12*; and (3) her allegation that in the March 8, 2018 grade-level meeting, Ranata Brown stated that she did not, and would not, help Daniel in the classroom, *id.* at 16.[14]

But none of those incidents support an inference of discrimination.  As previously stated, there is no evidence that *Sweet's* displeasure at Daniel's failure to remain at her door had any bearing on *David's* decision to recommend nonrenewal of Daniel's employment contract and Daniel's statement that Sweet did not write up Eppinger for using profanity is based only on hearsay.  Additionally, there is no evidence that David had any knowledge that others were not scolded when they failed to stay at their doors or not written up when they used profanity.  *See Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) (stating that employee's allegations that others engaged in similar conduct and were not disciplined "are inapposite, absent any evidence" that the actual decisionmakers knew of the others' transgressions).  Finally, Daniel's allegation that Ranata Brown said she would not help Daniel is simply irrelevant.  While the School District does not raise the argument, "an inference of discrimination cannot arise from the acts of someone who did not take part in the decision-making process."  *White v. Wells Fargo Guard Serv.*, 908 F. Supp. 1570, 1584 (M.D. Ala. 1995) (citation omitted). It is undisputed that David is "the sole decision-maker at the building level regarding recommendations for renewal and/or nonrenewal."  Doc. 11-3 at 3.  When making these decisions, he does not receive input or recommendations from anyone else.  Doc. 11-6 at 10-11.  Sweet and Brown had no role in David's decision to recommend nonrenewal of Daniel's contract, so an inference of discrimination cannot arise from Sweet's or

---

[14] At least those are the incidents the School District thought she was referring to.  Doc. 17 at 3.

Brown's actions.  Daniel, therefore, cannot establish a convincing mosaic of circumstantial evidence.

In conclusion, Daniel has not established a prima facie case of racial discrimination based on the School District's decision to nonrenew her teaching contract because she has not shown that she was replaced by someone outside of her class or shown that the School District treated similarly situated employees outside her class more favorably.  Even if she had established a prima facie case, the School District has articulated legitimate, nondiscriminatory reasons for the nonrenewal.  Daniel's conclusory efforts to demonstrate pretext fail.  Further, Daniel's vague assertions about alleged instances of her being poorly treated do not show a convincing mosaic of circumstantial evidence sufficient to permit an inference of discrimination. Thus, the School District is entitled to summary judgment on Daniel's claim that she was terminated because of her race.

## B.  Abandoned claims

In her complaint, Daniel alleged that the decision to deny her an eighth-grade teaching position at Ballard-Hudson was made, at least in part, on the basis of race. Doc. 1 at 3.  In its summary judgment brief, the School District argues that (1) assignment to the sixth versus eighth grade was not an adverse employment action; (2) there is no evidence that any similarly situated employees outside of her class were treated more favorably; and (3) even assuming Daniel could establish a prima facie case, it has proffered legitimate, nondiscriminatory reasons for placing her in the sixth grade rather than the eighth grade.  Doc. 11-2 at 11.

In response, Daniel says nothing, and for good reason.  She cannot make out a prima facie case and there is no evidence suggesting she can rebut the School District's reasons for its action.

Placement in a sixth-grade teaching position versus an eighth-grade teaching position did not alter Daniel's salary, benefits, job responsibilities, or workdays.  Doc. 11-5 at 2.  Daniel's "personal preference" to be assigned to the eighth grade does not mean the decision to place her in the sixth grade was an adverse action under Title VII. *Doe v. Dekalb Cty. Sch. Dist.*, 145 F.3d 1441, 1450 (11th Cir. 1998).  Instead, the question is whether a "reasonable person in the circumstances" would view placement in the sixth versus the eighth grade as "materially adverse."  *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) (citation omitted).  Importantly, to qualify as an adverse action, the "employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way."  *Id.* (citation omitted).  Under this standard, Daniel has not shown that the School District's decision to place her in a teaching position in the sixth grade was an adverse employment action.  Nor is there any evidence that anyone outside Daniel's class was treated more favorably with respect to requesting and being granted a specific grade position.  *Lewis*, 918 F.3d at 1222-24.

Finally, even if Daniel could establish a prima facie case, the School District had legitimate nondiscriminatory reasons for placing Daniel in the sixth grade instead of the eighth.  David testified that he decided to assign Daniel to the sixth grade because she had never taught in a regular classroom with an unscripted curriculum in the School District, the content for the sixth grade is less advanced than that for the eighth, and the sixth-grade teachers teach only one subject while the eighth-grade teachers teach two

subjects.  Doc. 11-3 at 3-5.  Daniel does not question these reasons; much less establish they were pretextual.

In her complaint, Daniel also alleged that the decision to transfer her from the sixth-grade position was based, at least in part, on her race.  Doc. 1 at 3.  But in her deposition, Daniel testified that she requested to be transferred out of the sixth-grade position.  Doc. 11-12 at 71, 196.  While this raises potential Rule 11 issues, it perhaps explains why she abandoned this claim when she responded to the School District's motion for summary judgment.

In any event, she cannot establish that the decision to transfer her from the sixth-grade teaching position into the seventh-grade position was an adverse employment action.  Placement in the seventh grade rather than the eighth did not "impact the 'terms, conditions, or privileges' of [Daniel's] job in a real and demonstrable way." *Davis*, 245 F.3d at 1239 (citation omitted).  She had the same salary, benefits, job responsibilities, and workdays regardless of whether she taught the sixth, seventh, or eighth grade.  Doc. 11-5 at 2.

Nor is there any evidence that similarly situated employees outside of Daniel's protected class were treated more favorably with respect to mid-year transfers.

Finally, even if Daniel had attempted to establish a prima facie case, the School District had legitimate reasons for its action.  David stated Daniel had not demonstrated the ability to effectively manage and properly instruct students in a less advanced, single-content classroom.  Doc. 11-3 at 3-5.  He, therefore, did not think she could handle the eighth-grade position that covered two content areas.  *Id.* at 5.

Daniel has not shown that these reasons were unworthy of credence.

### C.  Claim raised for the first time in her response to the School District's motion for summary judgment

Daniel alleges in her response brief that forcing her to remain in the sixth-grade teaching position until March 2018, rather than transferring her sooner, was an adverse employment action.  Doc. 13 at 2.  A plaintiff cannot amend her complaint by raising a claim for the first time in her response to the defendant's motion for summary judgment. *Miccosukee Indian Tribes of Fla.*, 716 F.3d at 559.  A district court cannot effectively amend a plaintiff's complaint *sua sponte* by addressing a claim raised for the first time in the plaintiff's response brief.  *Id.*

In any event, the claim is without merit.  Daniel testified that as early as November 2017 she asked to be removed from the sixth-grade position and placed in an eighth-grade teaching position.  Doc. 11-12 at 71, 196.  It is not clear to whom she made this request.  She was eventually moved from the sixth-grade position and placed in a seventh-grade teaching position after the March 8, 2018 grade-level meeting and her complaint to the School District's Human Resources department about the meeting. *Id*; Doc. 11-3 at 5.

The School District argues that moving Daniel from the sixth-grade position and placing her as a teacher in a different grade at Ballard-Hudson is a lateral transfer, and the denial of such does not amount to an adverse employment action.  Doc. 17 at 3.  According to the School District, a denial of a transfer request constitutes an adverse employment action only if the sought-after position "entails an increase in pay, prestige, or responsibility."  *Id.* (internal quotation marks and citation omitted).

Daniel argues that she "is not required to show the adverse action constituted an 'ultimate or substantial employment action.'"  Doc. 13 at 3 (citing *Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008) and *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453

(11th Cir. 1998)).  This argument is correct for her Title VII retaliation claim, which is discussed below, but is incorrect for her Title VII discrimination claim.  For retaliation claims, the Supreme Court has "broadened" the type of employer conduct considered actionable "from that which adversely effects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related" *Crawford*, 529 F.3d at 973 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "Retaliation claims have a relaxed standard requiring only a showing of a materially adverse action that 'might [] dissuade[] a reasonable worker from making or supporting a charge of discrimination.'" *Minnifield v. City of Birmingham Dep't of Police*, 791 F. App'x 86, 90 (2019) (quoting *Crawford*, 529 F.3d at 974).  But the Eleventh Circuit's standard for showing an adverse employment action for Title VII discrimination has not changed: a plaintiff must "establish an 'ultimate employment decision' or make some other showing of substantiality in the employment context in order to establish an adverse employment action." *Crawford*, 529 F.3d at 970 (citations omitted).  Ultimate employment decisions generally involve "termination, failure to hire, or demotion." *Id.* (quotation marks and citation omitted).  If the employer's conduct falls short of an ultimate employment decision, it must, "in some substantial way, alter[ ] the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect[ ] his or her status as an employee." *Id.* (quotation marks and citation omitted).  A plaintiff alleging discrimination must "demonstrate that she suffered a serious and material change in the terms, conditions, or privileges of employment to show an adverse employment action." *Id.* at 970-71 (quotation marks and citation omitted); *Minnifield*, 791 F. App'x at 90.

Daniel argues that failing to transfer her from the sixth-grade position was an adverse employment action because she was forced to work under Sweet, who "was going to do anything and everything possible to prevent [Daniel] from succeeding as a sixth-grade teacher at" Ballard-Hudson.[15]  Doc. 13 at 2.  The School District points out that an earlier transfer from the sixth grade to the seventh or eighth grade would not have resulted in an increase of pay, change of benefits, change in schedule, or change in responsibilities.  Doc. 11-5 at 2.  Thus, it does not appear a transfer would have made "a serious and material change in the terms, conditions, or privileges of [Daniel's] employment."  *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001), *overruled on other grounds by Burlington*, 548 U.S. at 57.  The failure to transfer Daniel prior to March, therefore, was not an adverse employment action.

Perhaps more importantly, the record does not support Daniel's argument that failing to transfer her from the sixth grade forced her to work with Sweet as her immediate supervisor.  Daniel testified that *prior to* her transfer to the seventh-grade teaching position, David agreed to change her immediate supervisor from Sweet to Kenya Miller.  Doc. 11-12 at 72-74.  It is not clear when the change was made, but it is clear that the failure to give Daniel an earlier transfer out of the sixth-grade teaching position did not force her to work under Sweet.  Miller was her immediate supervisor even before she was transferred to the seventh grade.  *Id.*

---

[15] Daniel provides several examples of Sweet's actions or inactions: Sweet refused to discipline a student who threatened to punch Daniel, but Sweet recommended transfer for a student who threatened another teacher; Sweet "wrote up a bogus disciplinary action" against Daniel for using profanity but failed to discipline an African-American teacher who used profanity; Sweet prevented Plaintiff from administering tests that would provide the data Daniel needed to make progress in the School District's evaluation system; Sweet berated Daniel in the presence of other teachers and students for infractions that others committed regularly without repercussion; and Sweet prevented Daniel from participating in a parent-teacher conference but allowed an African-American teacher to attend the conference.  Doc. 13 at 2-3.

Additionally, Daniel has not shown that any similarly situated employee outside of her protected class was treated more favorably with respect to a requested transfer. For these reasons, Daniel has not established a prima facie case of discrimination based on David's refusal to transfer her from the sixth grade prior to March 2018. The School District is, therefore, entitled to summary judgment on this issue.

## IV.  AGE DISCRIMINATION UNDER THE ADEA

The ADEA provides, in relevant part, that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  To establish unlawful age discrimination under the ADEA, a "plaintiff must prove by a preponderance of the evidence . . . that age was the 'but-for' cause of the challenged employer decision."  *Gross v. FBL Fin. Servs.,* 557 U.S. 167, 177-78 (2009).

Daniel argues that the nonrenewal of her employment contract was based, at least in part, on her age.  She acknowledges that she was not replaced by a younger person and she cannot "produce a comparator."  Doc. 13 at 5.  But she argues there is circumstantial evidence of the School District's discriminatory intent.  *Id.*  (citations omitted).  "[T]he plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  *Smith*, 644 F.3d at 1328 (citation omitted); *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013) (citing *Smith,* 644 F.3d at 1321)  "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  *Sims*, 704 F.3d at 1333 (quotation marks and

citation omitted).  The circumstantial evidence must "raise[] a reasonable inference" that the School District discriminated against the plaintiff.  *Smith,* 644 F.3d at 1328.

Daniel's entire "mosaic of circumstantial evidence" to establish age-based discrimination consists of three allegations: (1) her co-worker's "thinly-veiled comments about [her] age with statements referring to the length of time [Daniel] has been teaching and suggesting that because she had been teaching so long that she must not know the best practices any longer," Doc. 13 at 5; (2) "younger employees were treated better" than [Daniel], *id.* at 6; and (3) Stanley was not warned or disciplined for "threatening [Daniel] with a fist," but Daniel was shoved out of the classroom, *id.*

The Court takes Daniel's coworkers' comments for all they can be taken for— *alleged* comments by non-decision makers with veiled references to age.[16] Assuming Daniel's point is that the statements were made in her presence, the Court does not, as the School District urges, dismiss all the comments as hearsay.  But Daniel admits she never reported these comments to David or any other administrator.  Doc. 11-12 at 197-98.  Because decision-makers did not know about Stanley and Thomas' alleged comments, clearly those comments are not notice of coworker age bias and are not evidence, direct or circumstantial, of discriminatory intent on the part of David and Busbee when they made the decision not to renew Daniel's contract.  *Compare Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1362 (11th Cir. 1999) (stating that the decision maker's statement that he wanted to promote "'aggressive, young men'" was "highly suggestive circumstantial evidence from which a jury could infer discriminatory animus") with *Ritchie v. Indus. Steel, Inc.*, 426 F. App'x 867, 874 (11th

---

[16] The Court emphasizes alleged.  While Daniel testified that Stanley and Thomas said on several occasions that she "might not be up on best practices because [she] had been teaching so long," Docs. 11-12 at 97, 197, neither Stanley nor Thomas were asked if they made these comments when Daniel took their depositions.  Docs. 11-9; 11-11.

Cir. 2011) (derogatory comments about age from "employees or supervisors who did not play a role in the decision to terminate" do not show discriminatory animus).

Daniel's statement that younger employees were treated better than she is too conclusory to establish an inference of age discrimination.  Perhaps as an example of younger employees receiving better treatment, Daniel refers to events that happened at the March 8, 2018 grade-level meeting.  She states that Stanley was not disciplined even though she threatened Daniel "with a fist," but Daniel "was shoved out of the classroom."  Doc. 13 at 6.  The record shows that neither Daniel nor Stanley were disciplined for the events that transpired at the March 8, 2018 grade-level meeting.  Busbee testified that "[n]o disciplinary action was recommended for any employee."  Doc. 11-5 at 3.  Nothing from that incident suggests discrimination based on age.

In sum, Daniel's circumstantial evidence does not raise a reasonable inference that the School District discriminated against her on the basis of age.  Thus, the School District is entitled to summary judgment on Daniel's ADEA age discrimination claim.

## V.   RETALIATION UNDER TITLE VII AND THE ADEA

Title VII prohibits retaliation against an employee "because [s]he has opposed any practice made an unlawful employment practice . . . , or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e–3(a).  The ADEA also contains an anti-retaliation provision, which prohibits employers from discriminating against an employee because she "has opposed any practice made unlawful by [the ADEA], or because [she] . . .  has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under [the ADEA]."  29 U.S.C. § 623(d).  Title VII and ADEA retaliation claims are both analyzed under the *McDonnell Douglas*

framework: To establish a prima facie case of retaliation, a plaintiff must "show that (1) she engaged in an activity protected [by Title VII or the ADEA] ; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford*, 529 F.3d at 970 (citation omitted); *Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1267 n. 6 (11th Cir.2001); *Stone v. Geico Gen. Ins. Co.*, 279 F. App'x 821, 823 (citation omitted) (11th Cir. 2008) (analyzing ADEA retaliation claim using the Title VII burden shifting framework).

The second element of a retaliation prima facie case—an adverse employment action—encompasses a wider range of conduct than Title VII's discrimination provision because "unlike the substantive provision, [the antiretaliation provision] is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington*, 548 U.S. at 64 (citation omitted).  Rather, "the [antiretaliation] provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee. . . ." *Id.* at 57.  Therefore, a plaintiff must show that the employer's actions are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Id.*

Daniel argues that to establish the third element of her prima facie case—causation— she "'need only show that the protected activity and the adverse action are not completely unrelated.'"  Doc. 13 at 7 (quoting *Wideman*, 141 F.3d at 1457).[17]

---

[17] In *Univ. of Texas Sw. Med. Ctr. v. Nassar*, The Supreme Court held that the plaintiff's ultimate burden requires a showing of but-for causation.  570 U.S. 338, 360 (2013).  Courts disagree on whether *Nassar's* but-for causation standard applies only to the ultimate burden, or also to the causation element of the *McDonnell Douglas* prima facie case.  *See Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250–51, 51 n.10 (4th Cir. 2015) (noting circuit split and citing cases).  The Eleventh Circuit has not taken a position on the issue, though unpublished decisions have extended the but-for causation requirement to the prima facie case.  *See Callahan v. City of Jacksonville*, 2020 U.S. App. LEXIS 5766 (11th Cir. Feb. 6, 2020); *Smith v. City of Fort Pierce, Fla.*, 565 F. App'x 774, 778–79 (11th Cir.2014); *Butterworth v. Lab. Corp. of Am. Holdings*, 581 F, App'x 813, 817 (11th Cir. 2014).  However, in pre-*Nassar*, published guidance, the Eleventh Circuit has clearly stated that the plaintiff's ultimate burden and the plaintiff's prima facie case are different.  *See Simmons* v. *Camden Cty. Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985) ("the sort

If the plaintiff establishes a prima facie case, the employer has the opportunity to "proffer a legitimate, non-retaliatory reason for the adverse employment action." *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998).  Afterwards, "[t]he plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct." *Id.* (citation omitted).

As she did with her race discrimination claims, Daniel, in her response to the School District's motion for summary judgment, abandons some of her retaliation claims and alleges a new claim.  The Court addresses first the one unabandoned claim, then her new claim, and finally confirms that her abandoned claims lack merit.

### A. Nonrenewal of Daniel's employment contract and being forced to remain in sixth grade

Daniel alleges two adverse employment actions because of her engagement in activity protected under Title VII and the ADEA: (1) In her complaint, she alleges that her employment contract was nonrenewed because she complained about and opposed the alleged race and age discrimination that she faced, Docs. 1 at 3, 7; 13 at

---

of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action . . . would rise to the level of direct evidence of discrimination.").  *McDonnell Douglas* is a framework for proving discrimination indirectly, and a showing of but-for causation would, in practice, often require direct evidence.  Further, courts have continued to analyze causation using the lighter burden of *Simmons*.  For example, the rule that temporal proximity between the protected activity and the adverse action will often satisfy causation remains unchanged.  *See, e.g., Callahan v, City of Jacksonville, Fla*, 2020 WL 914923, at *2 (11th Cir. Feb. 26, 2020) ("Causation [for purposes of the prima facie case] may be inferred by 'close temporal proximity between the statutorily protected activity and the adverse employment action'").  Of course, that showing of mere proximity, by itself, would rarely be enough to sustain a verdict for the plaintiff finding but-for causation.  Clearly, the required showing of causation in the *McDonnell Douglas* prima facie case is a lighter burden than that required at trial.  And even courts phrasing the prima facie case in terms of "but-for" causation cannot realistically evaluate whether discrimination was a but-for cause of the adverse action until they hear the defendants' argument about causation (the proffered "legitimate, non-discriminatory reason" for the adverse action) and hear the plaintiff's rebuttal to that argument (the pretext showing).  In lieu of binding precedent extending *Nassar* to the prima facie case, therefore, the Court continues to apply *Simmons*.  Even under that framework, Daniel cannot show causation here.

7-8; and (2) for the first time in her response to the School District's motion for summary judgment, Daniel claims, without citation to the record, that the School District retaliated against her by forcing her "to remain in the sixth-grade team."[18]  Doc. 13 at 7.

Daniel argues she engaged in protected speech on three occasions: (1) on an unknown date when she verbally complained to David that Sweet's October 30, 2017 "Letter of Concern," which accused Daniel of using profanity, was untrue and that Sweet "was mistreating [her] because of her age and race," Doc. 14 at 5-6; (2) on an unspecified date, after Sweet reprimanded "her for not being where she was supposed to be for the PBIS meeting," Daniel told David that "the harassment because of her . . . age and race was continuing and that something needed to be done about it," *id.* at 14; and (3) on March 8, 2018, when she told the School District that the mistreatment she endured at the March 8, 2018 meeting was based on her race, *id.* at 16.

The School District states that Daniel's first alleged instance of protected speech cannot serve as a basis for her retaliation claim because she admittedly "abandoned this protected expression when . . . David assured her the Letter of Concern would not go into her personnel file."  Doc. 17 at 8 (citing Doc. 11-12 at 125).  While Daniel did testify that she was content when David told her that the letter would not go in her personnel file, and she made no additional complaints regarding the October 30, 2017 Letter of Concern, the Court assumes that Daniel engaged in protected activity when she reported Sweet's actions to Daniel.  Doc. 11-12 at 124-26.  Regarding Daniel's second alleged expression of protected speech, the School District argues that a "vague, undated report to . . . David cannot serve as a basis for a claim of retaliation."

---

[18] For the reasons discussed above, Daniel cannot amend her complaint by raising claims in her response to the School District's motion for summary judgment.  Because the School District has addressed this claim, the Court will review it.

Doc. 17 at 9 (citing *Shenton v. Aerojet Rocketdyne, Inc.*, 2018 WL 4289326, at *6 (W.D. Va. 2018)).  While this Court agrees that this complaint to David is vague and undated, the Court again assumes that it constitutes protected speech.

Even assuming on both of these occasions Daniel engaged in an activity protected under Title VII and the ADEA and assuming "being forced to remain on the sixth-grade team" is an adverse employment action as is nonrenewal of her employment contract, Daniel has completely failed to show a causal relation between the protected activities and any adverse employment action.  Daniel testified that she could "not recall the dates" that she made these complaints to David.  Doc. 11-12 at 111.  Thus, Daniel cannot rely on temporal proximity between her alleged statements to David and any adverse employment action to show causation.  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).  In fact, Daniel has presented nothing linking these two reports of race and age discrimination to David with any alleged retaliation.

Regarding the third alleged instance of protected speech, the School District argues that it did not retaliate against Daniel for her March 8, 2018 report of racism by making Daniel remain with her sixth-grade team.  Instead, she was removed from the sixth-grade teaching position following her March 8, 2018 meeting at the School District's office.  Doc. 17 at 9.  Daniel testified that she was moved from the sixth-grade teaching position "because [she] asked to be moved after that March the 8th meeting." Doc. 11-12 at 195.  Thus, the School District obviously did not retaliate against her by making her stay in the sixth-grade teaching position and remain with her team.

Daniel argues that the School District retaliated against her for the March 8, 2018 report of racism when it nonrenewed her employment contract.  Doc. 13 at 7.  It is

undisputed that David submitted Daniel's at-risk form and documentation to Busbee on March 2, 2018.  Docs. 11-3 at 4, 7; 14 at 5.  It is also undisputed that David and Busbee met on March 6, 2018 to discuss his recommendations for teacher nonrenewals for the 2018-19 academic year, which included Daniel.  Docs. 11-1 at 4; 14 at 6.  On March 12, 2018, Busbee emailed David a list of five employees, one of whom was Daniel, and asked David to "confirm these employees will not get contracts and are nonrenewed."  Doc. 14-9 at 2.  David responded by email to Busbee on March 13, 2018, telling her that one of the employees submitted his resignation letter and David "decided to bring back" another employee, but the "others," including Daniel, "are correct."  *Id.*  Daniel argues that David "could have revoked the nonrenewal decision for [her] – as . . . [he] did for another employee – but [he] chose not to."  Doc. 13 at 7-8.  Instead, the School District issued its official notice of nonrenewal on March 20, 2018, less than two weeks after Daniel reported racism during her March 8, 2018 meeting at the School District's office.  Docs. 11-13 at 10; 13 at 8.

The School District argues that "[i]t defies logic that an employer should be forced to revoke an adverse employment action (nonrenewal) merely because an employee—later—makes a claim for discrimination."  Doc. 17 at 9.  The Court agrees.  "[I]n a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation."  *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (citation omitted); *Buchanan v. Delta Airlines, Inc.*, 727 F. App'x 639, 642 (11th Cir. 2008) (citation omitted).  In this case, "the record evidence is overwhelming" that the School District contemplated nonrenewing Daniel's employment contract before she

complained of racism on March 8, 2018.  *Drago*, 453 F.3d at 1308.  Thus, Daniel cannot rely on temporal proximity between her March 8, 2018 complaint regarding racism to the School District and the March 20, 2018 letter of nonrenewal to show causation.  She has failed to allege any causal link other than the temporal proximity of the two events. Daniel has, therefore, failed to show any relationship between protected activity and the alleged adverse employment action; she has failed to set forth a prima facie case. Having failed to establish a prima facie case or retaliation the School District is entitled to summary judgment.[19]

### B.  Abandoned retaliation claims

In her complaint, Daniel alleged she faced retaliation for "opposing . . . unlawful discrimination" and gave two "example[s]" of that retaliation: denial of "an eighth-grade teaching position and [removal] from a sixth-grade teaching position."  Doc. 1 at 3.  She did not address either of these "claims" in her response to the School District's motion for summary judgment, and thus has abandoned them.

Daniel also alleged in her complaint that her employment contract was not renewed because she filed a Charge of Discrimination with the EEOC.  *Id.*  That seems to be closer to a claim than an example, but she did not address that claim in her response brief either.  Nevertheless, the Court has reviewed the record and has confirmed that these "claims" lack merit.

It is undisputed that the decision to nonrenew Daniel's employment contract was made before Daniel filed her first EEOC Charge.  Daniel herself admitted this when, in her first Charge, she stated that she was "told by principal Eclan Davi[d] that she would

---

[19] Even if Daniel established a prima facie case, the School District, as discussed above, has amply demonstrated legitimate nondiscriminatory reasons for Daniel's termination, and Daniel has produced no evidence that those reasons are unworthy of credence.

not be renewed."  Doc. 11-13 at 106.  Because the decision to nonrenew Daniel's

employment contract was made before she filed her EEOC Charge of Discrimination

and there is no evidence, or even a contention, that the School District knew Daniel

intended to file a Charge, the School District's nonrenewal of her contract was not

retaliation for the subsequent EEOC Charge.

## VI.  HOSTILE WORK ENVIRONMENT

In her complaint, Daniel did not include a count for hostile work environment.

However, in her factual allegations, she claimed that she "has been subject to hostility

and poor treatment on the basis, at least in part, of her race," Doc. 1 at 4, and "her age,"

*Id.* at 5.  Apparently out of caution, the School District moved for summary judgment on

any possible hostile work environment claim, stating that the evidence, viewed in the

light most favorable to Daniel, showed only that Daniel, her team members, and Sweet

had on-going personality conflicts, which hardly demonstrated racial animus or age-

based hostility sufficient to sustain a claim for hostile work environment.  Doc.  11-2 at

17.

In response, Daniel says nothing, and it is clear that her complaint contains no

such claim.  But even if she did, like so many of her claims, she has abandoned it.

But once again, the Court has reviewed the record to confirm that Daniel does

not have a viable hostile work environment claim. To establish a prima facie case, a

plaintiff asserting a hostile work environment claim must show: (1) that she is a member

of a protected group; (2) that she has been subject to unwelcome harassment; (3) that

the harassment is based on a protected characteristic; (4) that the harassment was

sufficiently severe or pervasive to alter the terms and conditions of employment and

create a discriminatorily abusive working environment; and (5) that the employer is

responsible, either directly or vicariously.  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).  Courts look at the totality of the circumstances to determine if the nature of the harassment is severe and pervasive.  *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21-22 (1993).  This inquiry includes "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.* at 23.

For the reasons already discussed, Daniel cannot demonstrate, even if she tried, that she faced severe and pervasive harassment, based on any protected characteristic, for which the School District was responsible.  *See Miller*, 277 F.3d at 1275.

## VII. CONCLUSION

For the reasons stated above, the Defendant's motion for summary judgment, Doc. 11, is **GRANTED**, and judgment is entered for the Defendant.

**SO ORDERED**, this 11th day of May, 2020.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT